# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARSHALL SPIEGEL, individually and on behalf of a class of those similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 15 C 8504 |
| v. | ) ) ) | Judge Edmond E. Chang |
| JAMES T. REYNOLDS; JIM REYNOLDS; KRISTINA HIXSON REYNOLDS¹; and ASSOCIATED COMMUNITY SERVICES, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this proposed class action lawsuit, Marshall Spiegel claims that James T. Reynolds, Jim Reynolds, Kristina Hixson Reynolds, and Associated Community Services, Inc. (ACS) violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*² R. 1, Compl.; R. 46, Am. Compl.³ Specifically, Spiegel alleges that he and other class members received unwanted phone calls from ACS on behalf of The Breast Cancer Society, Inc., which Spiegel says is a sham charity run by the Reynoldses. Am. Compl. ¶¶ 1, 3. Now, James and Kristina Reynolds⁴ move to dismiss the case for lack of personal jurisdiction and all of the defendants move to

---

¹In their opening brief, the Defendants state (without contradiction by Spiegel) that Kristina Hixson Reynolds is misnamed in the Amended Complaint as "Kristina Hixon." *See* R. 49, Reynolds Defs.' Br. at 1 n.1. The Clerk's Office is directed to substitute Kristina Hixson Reynolds as the named defendant in place of Kristina Hixon.

²This Court has subject matter jurisdiction over the case based on diversity of citizenship, 28 U.S.C. § 1332.

³Citations to the docket are indicated by "R.," followed by the docket entry number.

⁴In May 2016, the Court stayed this case against Jim Reynolds after learning that he filed for Chapter 7 bankruptcy. *See* R. 57, 05/26/16 Minute Entry.

dismiss for failure to adequately state a claim.[5] R. 48, Reynolds Defs.' Mot. to Dismiss; R. 49, Reynolds Defs.' Br.; R. 50, ACS Def.'s Mot. to Dismiss; R. 51, ACS Def.'s Br. For the reasons discussed below, the Court denies the Reynoldses' motion to dismiss for lack of personal jurisdiction, but without prejudice so that they may file another Rule 12(b)(2) motion to dismiss if, after jurisdictional discovery, the facts still support the motion. The Court also denies the Defendants' motion to dismiss for failure to state a claim.

## I. Background

For purposes of this motion, the Court must accept as true the allegations in Spiegel's First Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Spiegel has been on the National Do Not Call Registry since 2003. Am. Compl. ¶ 12. Between October 2013 and August 2014, Spiegel received four calls on his home telephone from ACS, a Michigan-based telemarketing company. *Id.* ¶¶ 5, 13, 29. These calls "sought donations and/or the purchase of goods or services" on behalf of The Breast Cancer Society, Inc. (call it the "Society" for short) pursuant to a services contract between ACS and the Society. *Id.* ¶¶ 1, 28, 30(e); R. 49-1, James Reynolds Decl. ¶¶ 9-10. According to Spiegel, the Society is a "sham charity" run by the Reynoldses. Am. Compl. ¶¶ 1, 3, 30(a). That is, the Reynoldses used the donations

---

[5]For convenience's sake, the Court will refer to James Reynolds and Kristina Hixson Reynolds as "the Reynoldses" throughout this Opinion. ACS originally moved to dismiss the case under Rule 12(b)(6) on its own, *see* R. 50, ACS Def.'s Mot. to Dismiss, but the Reynoldses have since "join[ed] ACS's renewed ... motion to dismiss ... and ACS's memorandum in support of that motion, and respectfully request dismissal as to them for the reasons stated in those filings," R. 55, Reynolds Def.'s Reply Br. at 11. So, the Court will treat ACS's Rule 12(b)(6) motion as a motion brought on behalf of all of the defendants for failure to state a claim.

2

collected by the Society to line their own pockets, not for any charitable purpose. *Id.* ¶¶ 34, 35. ACS also was in on the scheme, feathering its own nest with the donations it elicited on behalf of the Society all the while knowing that the Society was a sham charity. *Id.* ¶¶ 30(b), 34, 39. So, even though "each call placed by ACS [was] purportedly for the benefit of [the Society]," in reality ACS made the calls "on behalf of, and for the benefit of, ACS and the Reynolds family." *Id.* ¶ 38; *see also id.* ¶¶ 7, 9, 13, 30.

Spiegel now brings one claim against the Reynoldses and ACS for violation of the Telephone Consumer Protection Act (TCPA).[6] *See* Am. Compl. He alleges that the Defendants violated the TCPA's do-not-call provisions when ACS called him and other Illinois residents on behalf of the Society, *id.* ¶¶ 25, 30; *see* 47 U.S.C. § 227(c). Because the Society is a sham charity, Spiegel's theory goes, the calls do not fall under the TCPA's exception for calls made "[b]y or on behalf of a tax-exempt nonprofit organization." 47 C.F.R. § 64.1200(f)(14)(iii). The Reynoldses move to dismiss the case against them for lack of personal jurisdiction, and all of the Defendants move to dismiss for failure to adequately state a claim.

## II. Standard

### A. Rule 12(b)(2)

The plaintiff bears the burden of establishing that personal jurisdiction is proper when jurisdiction is challenged by the defendant. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (noting that the plaintiff

---

[6]Spiegel also alleges that ACS made two calls to his cell phone between April 2014 and January 2015, *see* Am. Compl. ¶ 13, but has since voluntarily withdrawn that part of his TCPA claim, *see* R. 56-2, Exh. 2.

3

must generally only make a prima facie case of personal jurisdiction). When personal jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(2) and material facts necessary to rule on the issue are in dispute, the Court must grant discovery and hold an evidentiary hearing to resolve the dispute. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Then, "the plaintiff must establish jurisdiction by a preponderance of the evidence," *Purdue Research Found.*, 338 F.3d at 783, and "prove what it alleged" at that hearing, *Hyatt Int'l Corp.*, 302 F.3d at 713. This is in contrast to what is "[n]ormally [done] on review of a motion to dismiss," where the Court "accepts all well-pleaded allegations in the complaint as true." *Purdue Research Found.*, 338 F.3d at 783.

### B. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis of the Reynoldses' 12(b)(2) Motion

When a federal district court sits in diversity, it has personal jurisdiction over a nonresident defendant "only if a court of the state in which it sits would have jurisdiction." *Purdue Research Found.*, 338 F.3d at 779. An Illinois court has personal jurisdiction over a nonresident when Illinois's long-arm statute authorizes jurisdiction and when the assertion of personal jurisdiction comports with the requirements of the Fourteenth Amendment's Due Process Clause.[7] U.S. Const. amend. XIV, § 1; *Hyatt Int'l Corp.*, 302 F.3d at 714. "Because Illinois permits personal jurisdiction if it would be authorized by … the United States Constitution, the state statutory and federal constitutional requirements merge." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). Therefore, if personal

---

[7]Although the Illinois Constitution's due process clause, Ill. Const. art. I, § 2, might theoretically impose another constraint on personal jurisdiction, the Seventh Circuit has held that, at least in the personal-jurisdiction context, "nothing in Illinois law … suggests that the due process limits … would be different at the state level and the federal level," *Hyatt Int'l Corp.*, 302 F.3d at 715.

5

jurisdiction would be constitutional, the Illinois long-arm statute is satisfied. *See* 735 ILCS 5/2-209(c).

Under the Fourteenth Amendment's Due Process Clause, personal jurisdiction is proper only when the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Personal jurisdiction may be general or specific to the claims made in the case. *uBID*, 623 F.3d at 425; *Tamburo v. Dworkin*, 601 F.3d 693, 701-02 (7th Cir. 2010). If the defendant's contacts with the state are "continuous and systematic," the defendant is subject to general jurisdiction there in any action, regardless of whether the action is related to those contacts. *Tamburo*, 601 F.3d at 701 (internal quotation marks and citation omitted). But because Spiegel contends only that the Court has *specific* jurisdiction over the Reynoldses, that is the only relevant theory of jurisdiction here. *See* Am. Compl. ¶ 9 ("By profiting from tortious acts committed within the State [the Reynoldses] have submitted to personal jurisdiction here."). Specific jurisdiction is proper when a defendant directs his activities at the forum state and the cause of action relates to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). There must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State … ." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

The Seventh Circuit has explained that "the contacts supporting specific jurisdiction can take many different forms." *uBID*, 623 F.3d at 426. One way to be on the personal-jurisdiction hook is to deploy agents to the forum state, *Int'l Shoe*, 326 U.S. at 318-20, and another way is to act through someone else to commit a tort within the forum state, *see IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998); *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994). Above all, the defendant must "purposefully direct[]" his activities at the forum state. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) (internal quotation marks and citation omitted). *Purposefulness* is crucial: "[t]he due process clause will not permit jurisdiction to be based on contacts with the forum that are random, fortuitous, or attenuated." *uBID*, 623 F.3d at 426 (citing *Burger King*, 471 U.S. at 475). The Supreme Court recently repeated that the required connection to the forum must arise from the defendant's *conduct*, not just the relationship, standing alone, between the defendant and the plaintiff. *Walden v. Fiore*, 134 S. Ct. 1115, 1122-23 (2014).

Spiegel advances two theories to contend that James and Kristina Reynolds, both Arizona residents, *see* James Reynolds Decl. ¶ 2; R. 49-2, Kristina Reynolds Decl. ¶ 2, meet the minimum-contacts standard in Illinois. First, he asserts that the Society was the Reynoldses' alter ego such that the Court should attribute the Society's contacts to the Reynoldses for purposes of personal jurisdiction. R. 54, Spiegel's Resp. Br. at 2, 5-8; *see also* Am. Compl. ¶¶ 3, 9, 30(a), 34, 44(b). Second, he asserts that the Reynoldses, acting through their agent ACS, "directed the calling

7

campaigns at issue … for their own benefit … ." Spiegel's Resp. Br. at 6 ("Plaintiff's basis for personal jurisdiction rests primarily on the actions of the Reynolds[es'] *agent*, ACS." (emphasis in original)); *id.* at 2; *see also* Am. Compl. ¶¶ 3, 7, 9, 13, 38, 44. The Reynoldses maintain that neither theory applies.

**A. Alter Ego**

Scrutinizing Spiegel's "alter ego" theory begins (and ends) with the fiduciary shield doctrine. That doctrine prevents a court from exercising personal jurisdiction over an individual defendant "whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice*, 38 F.3d at 912; *see also YKK USA, Inc. v. Baron*, 976 F. Supp. 743, 747 (N.D. Ill. 1997) ("Under the doctrine, if an individual's contacts with the forum state are acts performed in his or her representative capacity, personal jurisdiction based on these acts is improper."). Declining to exercise personal jurisdiction over the defendant in these cases makes sense: "'it [would be] unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.'" *YKK USA, Inc.*, 976 F. Supp. at 747 (quoting *Washburn v. Becker*, 542 N.E.2d 764, 766 (Ill. App. Ct. 1989)). There are, however, exceptions to the fiduciary shield doctrine, including the "alter ego" exception.[8] *See Kouakou v. Sutton Funding, LLC*, 2012 WL

---

[8]Another exception to the fiduciary shield doctrine applies where the defendant "was acting also or instead on his own behalf—to 'serve his personal interests[.]'" *Rice*, 38 F.3d at 912 (quoting *Rollins v. Ellwood*, 565 N.E.2d 1202, 1318 (Ill. 1990)). Spiegel asserts that this exception also warrants exercising personal jurisdiction over the Reynoldses. Spiegel's Resp. Br. at 7 ("[T]he fiduciary shield doctrine fails independently because the defendants were at all times acting to serve their own personal interests."). The Court need not address

8

581179, at *3 (N.D. Ill. Feb. 22, 2012) (describing the "alter-ego" exception to the fiduciary shield doctrine); *YKK USA, Inc.*, 976 F. Supp. at 747 (same); *Torco Oil Co. v. Innovative Thermal Corp.*, 730 F. Supp. 126, 135-36 (N.D. Ill. 1989) (same). That exception applies "'in cases where [the] plaintiff seeks to pierce the corporate veil by alleging that the corporation was a mere shell utilized by the individual defendant for his own personal benefit,' for while it appears on the face that the individual is acting in a representative capacity, he is in fact pursuing self-interest … ." *Torco Oil Co.*, 730 F. Supp. at 135-36 (quoting *Hyatt Int'l Corp. v. Inversiones Los Jabillos, C.A.*, 558 F. Supp. 932, 936 (N.D. Ill. 1982)).

It is true that the Amended Complaint is chock-full of allegations that the Society was the Reynoldses' alter ego. Spiegel alleges that the Society was a sham charity used by the Reynoldses to obtain illicit monies ultimately spent on themselves, and not on any cancer-fighting cause. *See* Am. Compl. ¶¶ 3, 34, 35, 44(b). But what is missing from the Amended Complaint are any allegations about what the Reynoldses *personally* did in Illinois. This is fatal to Spiegel's "alter-ego" argument because "the fiduciary shield doctrine is applied when a defendant commits an act within the forum on behalf of a corporation … ." *Kouakou*, 2012 WL 581179, at *4; *Flexicorps, Inc. v. Benjamin & Williams Debt Collectors, Inc.*, 2007

---

the "serving personal interests" exception separately from the "alter-ego" exception to the fiduciary shield doctrine. This is because both exceptions really focus on the same issue, that is, whether the individual defendant acted for his own personal benefit, instead of on behalf of his employer or other principal. And both exceptions do not apply here for the same reason, namely that Spiegel has failed to make the threshold, prima facie showing that the Reynoldses had sufficient minimum contacts with Illinois. *See Kouakou*, 2012 WL 581179, at *4; *Flexicorps, Inc. v. Benjamin & Williams Debt Collectors, Inc.*, 2007 WL 1560212, at *3 (N.D. Ill. May 29, 2007); *see also Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012); *Rice*, 38 F.3d at 912.

9

WL 1560212, at *3 (N.D. Ill. May 29, 2007) ("In order for the fiduciary shield doctrine to apply, the individual first must have minimum contacts with the forum state sufficient to establish personal jurisdiction."); *see also Rice*, 38 F.3d at 912 (fiduciary shield doctrine "denies personal jurisdiction over an individual whose *presence and activity in the state* … were solely on behalf of his employer or other principal" (emphasis added)). In this case, there is nothing to suggest that the Reynoldses themselves committed any act in Illinois, so the Court cannot exercise personal jurisdiction over the Reynoldses on an alter-ego theory.[9] *See Kouakou*, 2012 WL 581179, at *4 ("Since the fiduciary shield doctrine is applied when a defendant commits an act within the forum on behalf of a corporation, the fiduciary shield doctrine is not relevant to the court's determination of whether the court has personal jurisdiction over Riley or Likens.").

## B. Agency

There is no question that *ACS*'s contacts with Illinois, which include placing telemarketing calls to Spiegel and other Illinois residents, *see* Am. Compl. ¶¶ 7, 29,

---

[9]To the extent that Spiegel pleads a veil-piercing theory of liability—the Amended Complaint requests "[a]n Order stating th[at] … any corporate veil should be pierced and disregarded," Am. Compl. ¶ 44(b)—the Court likewise cannot exercise personal jurisdiction over the Reynoldses on that basis either. This is because "regardless of the substantive standards that the [C]ourt would use to evaluate the merits of [Spiegel's] piercing claims, he must still make a prima facie showing that [the Reynoldses] had sufficient minimum contacts with [Illinois] to support the exercise of personal jurisdiction." *McNutt v. Weinerman & Assocs., LLC*, 2016 WL 492325, at *5 (W.D. Wis. Feb. 8, 2016) (citing *Felland*, 682 F.3d at 673 (rejecting plaintiff's argument that veil piercing allegations supported the exercise of personal jurisdiction over the defendants in a TCPA case)); *see also IDS Life Ins. Co.*, 136 F.3d at 540 (observing that "the complaint does not allege that SunAmerica itself committed any of the tortious acts that are charged," and "even if [the complaint alleged that SunAmerica controlled, directed, and supervised the three subsidiaries that actually did the acts] this would not establish jurisdiction over SunAmerica."). The allegations in the Amended Complaint do not meet this standard, so personal jurisdiction based on Spiegel's bare veil-piercing allegations is also off the table.

meet the minimum-contacts standard. *See Burger King*, 471 U.S. at 474-76. And the Reynoldses could be haled into court here if ACS was in fact their agent. *See Int'l Shoe*, 326 U.S. at 318-20; *see also, e.g.*, *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 821 (N.D. Ill. 2008). But the Reynoldses assert that ACS was not their agent and that the "Amended Complaint is devoid of any facts" that support an agency finding. R. 55, Reynolds Defs.' Reply Br. at 5-8. For the reasons discussed below, because the material facts relevant to deciding whether there was an agency relationship between the Reynolds and ACS are in dispute, the Court must engage in fact-finding. And before engaging in the necessary fact-finding (including, potentially, an evidentiary hearing), the parties will be authorized to conduct discovery on the question of personal jurisdiction over the Reynoldses. *See Hyatt Int'l Corp.*, 302 F.3d at 713.

Personal jurisdiction based on agency is only proper if Spiegel can show that ACS had either actual or apparent authority to act for the Reynoldses. *See Waldock v. M.J. Select Global, Ltd.*, 2005 WL 2737502, at *7 (N.D. Ill. Oct. 24, 2005) ("The party asserting the agency relationship bears the burden of showing the existence of an agency relationship."). The Amended Complaint does not allege that the Reynoldses ever interacted with Spiegel, so apparent authority is off the table.[10] That leaves actual authority, which comes in two flavors: express or implied. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000). Express actual

---

[10]"Apparent authority exists where a principal, through his words or conduct, creates a reasonable impression that the agent has been granted the authority to perform certain acts." *Damian Servs. Corp. v. PLC Servs., Inc.*, 763 F. Supp. 369, 372 (N.D. Ill. 1991).

11

authority is given when a "principal explicitly grants the agent the authority to perform a particular act." *Id.* (quoting *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 783 (Ill. App. Ct. 1999)). Implied actual authority is the authority, even if not explicitly stated, to perform any "reasonably necessary" steps in order to complete an act for which an agent is expressly authorized. *Id.*

Several allegations in the Amended Complaint support—if true—a finding that there was an agency relationship between the Reynoldses and ACS. First, Spiegel alleges that the Reynoldses are "responsible for all actions of [the Society]." Am. Compl. ¶ 3. Those "actions" include entering into a services contract that allegedly was the premise of the telemarketing scheme at issue in this case. Second, Spiegel alleges that "[t]he Reynoldses, *through* telemarketing efforts by ACS availed themselves of benefits in Illinois … [and] profited and benefitted from deception directed into Illinois." *Id.* (emphasis added). Likewise, according to Spiegel, ACS carried out the "telemarketing scheme … with *[the Reynoldses'] knowledge and consent*." *Id.* ¶ 9 (emphasis added). ACS also made the telemarketing calls "on behalf of, and for the benefit of" the Reynoldses and their sham charity.[11] *Id.* ¶ 13; *see also id.* ¶¶ 7, 34, 38. And finally, Spiegel alleges that "the Reynolds family is *jointly and severally liable* for [ACS's] conduct … because they benefited from and shared in the profits generated from the calls and *conspired with ACS* to deceive consumers … ." *Id.* ¶ 44 (emphases added).

---

[11]Spiegel also alleges that ACS made the calls for its own benefit. *See* Am. Compl. ¶¶ 13, 30(c), 30(e), 38.

12

These allegations, if proven true, can establish that the Reynoldses orchestrated the telemarketing plan that placed calls into Illinois and used ACS as their agent to solicit donations from Illinois residents. This is particularly so given that agency turns on whether "the principal has the right to control the conduct of the agent and the agent has the power to affect the legal relations of the principal." *Taylor v. Kohli*, 642 N.E.2d 467, 468 (Ill. 1994); *accord Waldock*, 2005 WL 2737502, at *7 ("Courts assessing whether agency allegations sufficiently confer personal jurisdiction over an out-of-state party have looked to whether the allegations establish that the purported agent had the authority to legally bind the principal and whether the principal could control the actions of the agent regarding the matters entrusted to the agent."). Here, allegations that the Reynoldses operated "through telemarketing efforts by ACS," Am. Compl. ¶ 3, as well as "kn[ew] [of] and consent[ed] [to]" the telemarketing scheme, *id.* ¶ 9, support finding that ACS operated under the Reynoldses' control and for their benefit—in other words, that ACS was the Reynoldses' agent.[12]

On the other hand, there is evidence that goes against finding an agency relationship here. To start, the Reynoldses deny ever owning stock or working at ACS. James Reynolds Decl. ¶ 11; Kristina Reynolds Decl. ¶ 10. They also deny having "day-to-day involvement with ACS, or with ACS's actions taken pursuant to its agreement with [the Society]." James Reynolds Decl. ¶ 12; Kristina Reynolds Decl. ¶ 11. And finally, they deny ever directing ACS to call Illinois residents.

---

[12]That James Reynolds admits "[he] was a principal at [the Society when it] entered into [the] services agreement with [ACS]," James Reynolds Decl. ¶ 9, further supports an agency finding.

13

James Reynolds Decl. ¶ 12; Kristina Reynolds Decl. ¶ 11. According to the Reynoldses, ACS acted on its own accord: "ACS generated lists of names of persons … to call on behalf of [the Society]. ACS also was responsible for the training and supervision of the callers, as well as maintenance of the call list, the call center, telephone charges, office space, salaries and commissions of the persons making the calls, licenses, permits, taxes and bonds." James Reynolds Decl. ¶ 10; *see also* Reynolds Defs.' Reply Br. at 6 (reciting Spiegel's allegations that "the telemarketing calls in question were made 'on behalf of ACS'" (citations omitted)). If true, these statements weigh against a finding of agency.

In light of these competing positions, the Court must make factual findings. Perhaps the Reynoldses are right: ACS's contractual relationship with the Society or ACS's role in the telemarketing scheme (or both) should not be mistaken for a finding that ACS acted on the Reynoldses' behalf or subject to the Reynoldses' control. But as of now, Spiegel's allegations, if true, provide sufficient grounds that personal jurisdiction might be proper. And though the Reynoldses' statements certainly challenge those allegations, they are not enough to undermine them.

A period of jurisdictional discovery will be allowed. Discovery may reveal additional facts that would be helpful to resolving this factual dispute. For example, the services contract entered into by ACS and the Society, and the performance of the contract, may shed light on the relationship between ACS and the Reynoldses, as well as the extent to which the Reynoldses knew of the alleged telemarketing calls into Illinois. Communications between the Reynoldses and ACS also likely will

be relevant. The discovery schedule will be discussed at the next status hearing. For now, the Reynoldses' motion is denied, but without prejudice so that they may file another Rule 12(b)(2) motion to dismiss if, after discovery, the facts still support the motion.

**IV. Analysis of the Defendants' 12(b)(6) Motion**

The TCPA and its implementing regulations prohibit telemarketers from initiating any "telephone solicitation" to individuals whose phone numbers are registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(a)(4), (c); 47 C.F.R. § 64.1200(c), (f)(14). "Telephone solicitation" refers to "a telephone call or message [initiated] for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services … ." 47 C.F.R. § 64.1200(f)(14). But carved out of the solicitation ban are calls or messages made "[b]y or on behalf of a tax-exempt nonprofit organization." *Id.* Here, the Defendants contend that this exemption applies and dictates dismissal of this case. R. 56, ACS Def.'s Reply Br. at 4-7.

An extra analytical step has to be discussed before diving into the nuts and bolts of the nonprofit exemption: who bears the burden of proof on the applicability of the exemption. The Defendants do not explicitly dispute that the burden is on them, but it is worth addressing why they do, in fact, bear the burden. In short, the reason is that the Defendants are asserting the benefit of an exemption from the general rule that "telephone solicitation[s]" are subject to the TCPA's do-not-call provisions. *See* 47 C.F.R. § 64.1200(f)(14). It is well-established that "'the burden of

proving justification or exemption under a special exception to the prohibition of a statute generally rests on the one who claims its benefits,'" *N.L.R.B. v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001) (quoting *F.T.C. v, Morton Salt Co.*, 334 U.S. 37, 44-45 (1948)), which is exactly what the Defendants are trying to do here. *See Shaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (burden of proof shifts to defendant when element can be fairly characterized as an affirmative defense or exemption); *United States v. Dish Network, L.L.C.*, 75 F. Supp. 3d 942, 1008 (C.D. Ill. 2014) (treating the "established business relationship" exemption from the TCPA's definition of "telephone solicitation" as an affirmative defense that the defendant must prove), *vacated in part on other grounds on reconsideration*, 80 F. Supp. 3d 917 (C.D. Ill. 2015); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 397 (M.D.N.C. 2015) (same). So it is the Defendants who bear the burden of establishing that ACS called Spiegel and other Illinois residents "on behalf of a tax-exempt nonprofit organization." 47 C.F.R. § 64.1200(f)(14)(iii).

This, at least at the dismissal-motion stage, they cannot do. In order to take advantage of the exemption, the Defendants must establish that they called Spiegel and other class members (1) "on behalf of" (2) "a tax-exempt nonprofit organization." The second element is met—the IRS designated the Society as a tax-exempt nonprofit organization in 2007 and that designation has never been revoked, *see* R. 51-1, Exh. 1; *see also* ACS Def.'s Br. at 2, 7, 12-13; ACS Def.'s Reply Br. at 3, 10-12[13]—so the only issue is whether the Defendants acted "on behalf of" the Society.

---

[13]Spiegel contends that despite the IRS's designation, the Society does not satisfy the definition of a "tax-exempt nonprofit organization." *See* R. 53, Spiegel's Resp. Br. at 7-10. In

16

There is little legal authority on the TCPA's nonprofit exemption. But at least two Federal Communication Commission (FCC) orders offer some insight into what it means to call "on behalf of" a tax-exempt nonprofit. In 2005, the FCC issued an order clarifying the scope of the exemption. *See* 20 FCC Rcd. 3788 (2005). The order reaffirmed that the exemption did not apply to "for-profit companies that call to encourage the purchase of goods or services, yet donate some of the proceeds to a nonprofit organization." *Id.* at 3799-80. The FCC "distinguish[ed] these types of calls from those *initiated, directed and controlled by a tax-exempt nonprofit for its own fundraising purposes*," which are not considered telephone solicitations covered by the TCPA. *Id.* at 3800 (emphasis added). What's more, the FCC underscored that "a tax-exempt nonprofit organization that simply contracts out its *fundraising efforts* will not be subject to the restrictions on telephone solicitations." *Id.* (emphasis added). Seven years later, the FCC issued another order that further fleshed out the phrase "on behalf of": "the phrase 'on behalf of' include[s], among other things, 'in the interest of,' 'as a representative of,' and 'for the benefit of' — concepts that easily can be read to encompass common law agency principles." 28

---

other words, he maintains that the Court should independently decide whether the Society "actually satisfies the requirements imposed by 501(c)(3)," instead of relying on the IRS's finding. *Id.* at 7. But "[i]n the first instance … the responsibility for construing the Code falls to the IRS." *Bob Jones Univ. v. United States*, 461 U.S. 574, 596-97 (1983). Courts, in turn, are limited to "exercise[ing] review over IRS actions." *Id.* at 596; *see also Nat'l Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 488 (1979) ("The choice among reasonable interpretations [of the Internal Revenue Code] is for the Commissioner, not the courts."). Here, Spiegel asks the Court to entirely disregard the IRS's designation, going beyond even asking for review of it. Federal courts should not conduct their own *ad hoc* 501(c)(3) analysis in civil litigation between private parties—the IRS is not a party to this case, nor could it be—outside of any statutorily authorized framework for reviewing the administrative designation.

FCC Rcd. 6574, 6585 (2013) (addressing vicarious liability with respect to TCPA do-not-call violations).

At this stage in the case, the Defendants have not established that the Society "initiated, directed and controlled" ACS's telemarketing campaign "for its own fundraising purposes," 20 FCC Rcd. at 3780, or that ACS acted "'in the interest of' … and 'for the benefit of'" the Society, 28 FCC Rcd. at 6585. To start, Spiegel's allegations, if true, suggest that the primary purpose for the calls was to line the Defendants' pockets, rather than for the benefit of the Society or any cancer-fighting cause. *See* Am. Compl. ¶¶ 3, 7, 9, 13, 30, 34, 35. The Amended Complaint is also replete with allegations that the Society was a sham charity. *See id.* ¶¶ 1, 4, 7, 9, 30(a), 39. These allegations call into question whether the Society "initiated, directed and controlled" the calling campaign, and perhaps more importantly, whether it did so to further a legitimate "fundraising purpose[]." 20 FCC Rcd. at 3800. Not to mention that the Amended Complaint also alleges that ACS made the calls at issue at least in part "on behalf of" itself and the Reynoldses. *See* Am. Compl. ¶¶ 7, 13, 30(c), 30(e), 38. The problem for the Defendants is that, at the dismissal-motion stage, they cannot show that these allegations are false. *See* ACS Def.'s Reply Br. at 7-10. (And remember, the Defendants have the burden of proof here.)

*Wengle v. DialAmerica Marketing, Inc.*, 132 F. Supp. 3d 910 (E.D. Mich. 2015), one of only two federal court cases to scrutinize the nonprofit exemption, illustrates why the Defendants have not met their burden. In that case, the district

18

court, relying on the 2005 and 2013 FCC orders, granted a telemarketer's motion for summary judgment based on the exemption. *Id.* at 919-21. DialAmerica, the telemarketer, had conducted a magazine-sale fundraising campaign for the Special Olympics of Michigan pursuant to an agreement under which the Special Olympics retained 12.5% of the sales proceeds and 100% of the donations that DialAmerica collected. *Id.* at 913-14. The court concluded that the nonprofit exemption applied, relying on facts like the terms of the parties' contract, the content of the telemarketing script, the nature of the relationship vis-à-vis the Special Olympics and its customers, and the financial transaction itself. *Id.* at 919-21. This is the sort of evidence that the Defendants must rely on to establish that ACS made the alleged calls "on behalf of" the Society. Fact discovery might very well reveal that ACS's calling campaign fits within the nonprofit exemption, and the Defendants could raise the issue again at summary judgment. But for now, the Defendants' motion to dismiss based on the exemption must be denied.

## V. Conclusion

The Court denies without prejudice the Reynoldses' motion to dismiss for lack of personal jurisdiction, R. 48, and denies the Defendants' 12(b)(6) motion, R. 50. In light of the significant disputes over personal jurisdiction, the parties may conduct discovery on that limited issue. After discovery is completed, the Court will decide the jurisdictional facts, including conducting an evidentiary hearing if necessary. The discovery schedule will be discussed at the next status hearing. After the

discovery period, the Reynoldses may renew their motion to dismiss for lack of personal jurisdiction, if the facts still support the motion.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 22, 2016