UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARSHALL SPIEGEL, individually and on behalf of a class of those similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 15 C 8504 |
| v. | ) ) ) | Judge Edmond E. Chang |
| JAMES T. REYNOLDS; JIM REYNOLDS; KRISTINA HIXSON; and ASSOCIATED COMMUNITY SERVICES, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Marshall Spiegel contends that Associated Community Services (which does business under its acronym, ACS) violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, by calling him when his name appeared on the do-not-call registry and by using prerecorded voices in its solicitations.[1] R. 46, Am. Cmplt. ¶¶ 24-30; R. 97-1, Pl.'s Resp. Br. at 5.[2] He seeks class certification for himself and similarly situated persons. *Id*. at ¶ 1. After a sufficient period of discovery on limited issues, the Court authorized ACS to move for summary judgment. R. 93, Def. Mot. Summ. J. ACS argues that it is entitled to summary judgment because no material facts are genuinely disputed and (1) its calls to people on the do-not-call registry were made "on behalf of" a tax-exempt nonprofit

---

[1] The Court has federal-question jurisdiction over this case. 28 U.S.C. § 1331.
[2] Citations to the docket are indicated by "R." followed by the docket number and, where appropriate, a page or paragraph number.

organization, and thus not covered by the TCPA; (2) its calls to people on the do-not-call registry were not "telephone solicitation[s]" covered by the TCPA; and (3) Spiegel's prerecorded-voice claim was not alleged in the complaint and comes too late now. R. 94., Def.'s Br. at 8, 13; R. 100, Def. Reply at 5-6. For the reasons explained below, ACS's motion is granted.

## I. Background

In deciding a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party (here, Spiegel) and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). In this case, the parties agree on most of the facts. Defendant ACS is a registered professional fundraiser in the state of Illinois. Pl.'s Resp. DSOF[3] ¶ 5; DSOF Exh. 2. ACS had a longstanding contractual relationship with an organization called the Breast Cancer Society. Pl.'s Resp. DSOF ¶¶ 15-17. ACS's efforts for the Society involved placing phone calls to persons in an attempt to raise funds. Am. Cmplt. ¶ 13. The parties do not dispute that, at all times relevant to this litigation, the Society was recognized by the Internal Revenue Service as a tax-exempt nonprofit organization.[4] Pl.'s Resp. DSOF ¶¶ 12-13; DSOF Exh. 6.

---

[3] Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for ACS's Statement of Facts [R. 95], "Pl.'s Resp. DSOF" for Spiegel's response to the ACS's Statement of Facts [R. 97-1], and "PSOF" for Spiegel's Statement of Additional Facts [R. 97-1]. Unless otherwise noted, all facts are undisputed.

[4] Spiegel characterizes the Society as a "sham charity." Am. Cmplt. at ¶ 4. But the prior Opinion explained why federal courts cannot second-guess the IRS's designation of the Society as a tax-exempt nonprofit, which is the only thing that matters for purposes of the TCPA. *See Spiegel v. Reynolds*, 2016 WL 6877625, at *6 n. 13 (N.D. Ill. Nov. 22, 2016) (R. 63 at 16 n. 13).

The relationship between ACS and the Society began in 2007. DSOF ¶ 14. The parties dispute whether the Society solicited ACS's services. Pl.'s Resp. DSOF ¶ 14. ACS maintains that the Society approached ACS and asked whether ACS was interested in doing work for the Society. DSOF ¶ 14. But Spiegel points out that the evidence in the record is ambiguous on this point: ACS's witness does not seem to remember how the relationship began, and could not state with certainty that the Society initially solicited ACS. Pl.'s Resp. DSOF ¶ 14; DSOF Exh. 7 at 17:1-27:17.

Although the origin of the business relationship between ACS and the Society is disputed, the parties do agree on what were the general terms of the contract between ACS and the Society. The contracts between ACS and the Society stated that ACS was to conduct a public relations and solicitation campaign "on behalf of" [the Society]. Pl.'s Resp. DSOF ¶ 16; DSOF Exh. 8. All solicitation campaigns conducted pursuant to the 2007 ACS contract were to be "conducted in the name of [the Society]" using materials "approved by [the Society]." Pl.'s Resp. DSOF ¶ 17. DSOF Exh. 8 ¶¶ 2, 4, 19. ACS was contractually bound "[t]o engage in no activities in the name of [the Society] without its consent, and at all times to conduct business with due regard to the name and reputation of [the Society]." Pl.'s Resp. DSOF ¶ 18. DSOF Exh. 8 ¶ 4(c). Similarly, the 2011 contract directed ACS to "promote the purposes of [the Society]" and to "fulfill[] [the Society]'s purposes." Pl.'s Resp. DSOF ¶ 23; DSOF Exh. 10 ¶ 1.

The contracts between ACS and the Society permitted the Society to exercise control over the fundraising scripts and informational materials distributed by

3

ACS. For example, under the 2011 contract, ACS could only use scripts and promotional materials that had been approved in writing by the Society. Pl.'s Resp. DSOF ¶ 24. DSOF Exh. 10 ¶ 3.1. The parties do not dispute that the Society did exercise its right to control the content of the telemarketing scripts. Pl.'s Resp. DSOF ¶ 27. Emails between ACS and the Society's employees show that the Society's agents suggested edits to the ACS-proposed fundraising scripts. Pl.'s Resp. DSOF ¶ 29; *see also*, *e.g.*, DSOF Exhs. 15, 17. The Society's Executive Director, James Reynolds, would indicate his approval of a solicitation script by signing and dating a "Script Approval" form. Pl.'s Resp. DSOF ¶ 28; DSOF Exh. 16. ACS did not use scripts unless they had been reviewed and approved by the Society. Pl.'s Resp. DSOF ¶¶ 31-32. The Society also asserted editorial control over other written materials, like pledge reminder letters and informational inserts. Pl.'s Resp. DSOF ¶ 35; DSOF Exh. 21.

ACS's communications with call recipients emphasized that they were donating to the Society (not to ACS). The telemarketing scripts immediately informed donors that ACS was a professional fundraiser calling "on behalf of the Breast Cancer Society." Pl.'s Resp. DSOF ¶ 26; DSOF Exhs. 13-14. The written materials that ACS distributed in connection with its Society fundraising were on the Society's letterhead, contained the Society's logo, and were signed by James Reynolds (the Society's Executive Director). Pl.'s Resp. DSOF ¶¶ 33-34; DSOF Exhs. 18-20. Donors were instructed to make donations payable to "The Breast Cancer Society," and did so. Pl.'s Resp. DSOF ¶ 36; DSOF Exh. 22.

4

The parties also do not dispute the flow of cash between ACS and the Society. The Society contracted with an entity related to ACS for the processing of donations and follow-up correspondence with donors. This entity served as an "agent for [the Society]." Pl.'s Resp. DSOF ¶ 19; DSOF Exh. 9 at ¶ 1. When donors contributed money to the Society, the donated funds were deposited to a bank account "under the exclusive custody and control of [the Society]." DSOF Exh. 9 at ¶ 5, Exh. 8 at ¶ 22, Exh. 7 at 41:10-18; *see also* Pl.'s Resp. DSOF ¶ 20. Most supporters contributed money by check, but any credit card donations were handled by a payment processor hired by the Society. Pl.'s Resp. DSOF ¶ 21; DSOF Exh. 7 at 86:9-88:11. Even though all the donations were initially sent to the Society's bank account, ACS ultimately received 85% of all funds collected. R. 97-2, PSOF ¶ 37 & Cole Dep. 29:2-14 (attached to PSOF).

Finally, the parties agree on the facts specific to Spiegel's claims. ACS admits that it placed multiple calls to Spiegel's residential telephone number while that number was listed on the do-not-call registry. DSOF ¶ 8; DSOF Exh. 5. ACS did not call Spiegel's cell phone. Pl.'s Resp. DSOF ¶ 9; *see also* R. 50, Def.'s Mot. Diss. at 1-2. The contents of the phone calls are not in dispute. The telemarketing scripts show that ACS calls asked the call recipients to give money donations to the Breast Cancer Society. DSOF Exhs. 13, 14. The scripts informed the potential donors that the Breast Cancer Society gave direct aid to breast cancer patients by "helping out with things like medical supplies, pain medication, in-home health care, or … household expenses." DSOF Exh. 13. Speigel has pointed to no evidence that ACS

5

attempted to sell or promote any other products or services during the phone calls. The calls were made using pre-recorded voices to deliver the scripted messages. PSOF ¶ 38 & Cole Dep. at 47:10-50:19.

## II. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

At this stage of the litigation, Spiegel claims that ACS violated the TCPA by placing calls to residential phone lines listed on the do-not-call registry and by calling residential phone lines using prerecorded voices. Pl.'s Resp. Br. at 1. Both claims fail as a matter of law because the calls were made "on behalf of" the Society, a tax-exempt nonprofit organization. The do-not-call claim also fails because the calls did not constitute "telephone solicitation" under the TCPA.

#### A. The TCPA Nonprofit Exemption

The TCPA's implementing regulations prohibit "telephone solicitation[s]" to residential telephone subscribers whose phone numbers appear on the national do-not-call registry. 47 C.F.R. § 64.1200(c)(2). The regulations and the TCPA itself define "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(14); 47 U.S.C. § 227(a)(4). Calls by or on behalf of tax-exempt nonprofit organizations are *not* considered "telephone solicitation[s]." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(14)(iii).[5]

ACS has the burden of establishing the applicability of the nonprofit exemption, because the exemption is in the nature of an affirmative defense. *See Spiegel v. Reynolds*, 2016 WL 6877625 at *6 (N.D. Ill. Nov. 22, 2016) (R. 63 at 15-16). What's more, as the moving party on summary judgment, ACS has the burden of demonstrating that there is no genuine dispute of material fact and that it is

---

[5] The TCPA exempts calls "by" a tax-exempt nonprofit organization; its implementing regulations exempt calls made "by or on behalf of" a tax-exempt nonprofit organization. 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(14)(iii).

7

entitled to judgment as a matter of law on its nonprofit exemption defense. Fed. R. Civ. P. 56(a). Although case law applying the TCPA nonprofit exemption is sparse, the prior Opinion pointed to the thorough discussion in *Wengle v. DialAmerica Marketing, Inc.* 132 F. Supp. 3d 910 (E.D. Mich. 2015). In *Wengle*, the court held that a call is placed "on behalf of" a tax-exempt nonprofit when it is placed "for the benefit of or in the interest of the nonprofit, concepts that encompass common law agency principles." *Wengle*, 132 F. Supp. 3d at 919 (quotation marks omitted). So, in order to establish the applicability of the nonprofit exemption, ACS must show that it made the solicitation calls "on behalf of" the Society[6]—in other words, that ACS was acting in the Society's interest and as the Society's agent.[7]

ACS has met its burden. This is true even giving Spiegel the benefit of reasonable inferences. The undisputed evidence in the record demonstrates that ACS and the Society had a series of contracts which required ACS to solicit funds "on behalf of" the Society. Pl.'s Resp. DSOF ¶ 16; DSOF Exh. 8 (2007 ACS contract).

---

[6] It is undisputed that the Society was, at all relevant times, registered with the IRS as a tax-exempt nonprofit organization. Pl.'s Resp. DSOF ¶¶ 12-13; DSOF Exh. 6. Calls made "on behalf of" the Society would therefore qualify for the nonprofit exemption.

[7] At some points in the litigation, Spiegel appeared to argue that the applicability of the nonprofit exemption should depend on the percentage of funds received by the nonprofit. *See, e.g.*, DSOF Exh. 4, Pl.'s Resp. to Interrog. at ¶ 15. Spiegel backs off this argument in his brief, *see* Pl. Resp. at 2-4. This retreat is sensible: in addition to being a poor legal standard, interpreting the nonprofit exemption to include a percentage-of-funds threshold would likely cause the TCPA to run afoul of the First Amendment. *See Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 624, 626 (1980) (invalidating an ordinance that prohibited charitable organizations from soliciting contributions unless they used at least 75 percent of their receipts "directly for the charitable purpose of the organization"); *Sec. of State of Md. v. Joseph H. Munson, Co, Inc.*, 467 U.S. 947, 966 (1984) (invalidating a law prohibiting charitable organizations from soliciting if they paid or agreed to pay as expenses more than 25 percent of the amount raised); *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988) (invalidating a law requiring professional fundraisers to disclose to potential donors the percentage of the prior year's charitable contributions the fundraisers had actually turned over to the charity).

The contracts allowed the Society to exercise control over the manner of ACS's solicitations by giving the Society the right to review and veto the solicitation scripts and other materials used by ACS. Pl.'s Resp. DSOF ¶ 24; DSOF Exh. 10 ¶ 3.1. The Society also controlled the flow of cash from the fundraising. Pl.'s Resp. DSOF ¶¶ 19-22. And, most importantly, the actual conduct of the parties reflects a genuine agency relationship: Spiegel agrees that the Society did exercise control over ACS's activities on multiple occasions by providing edits and approval to call scripts and other written materials. Pl.'s Resp. DSOF ¶¶ 27-29. On this undisputed evidence, any reasonable jury must find that ACS made the calls "on behalf of" the Society, as the Society's agent.

Spiegel has failed to rebut this showing by "set[ting] forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The only fact that Spiegel disputes is ACS's assertion that the Society solicited their services (as opposed to ACS reaching out to the Society). Pl.'s Resp. DSOF ¶ 14. Spiegel also points out (and ACS does not dispute) that ACS took home 85% of the funds it raised for the Society. Pl. Resp. 2. These two facts, however, are not enough to create a genuine issue for trial. Taking the inferences Spiegel's favor, the Court assumes that it was ACS that reached out to solicit the Society's business, rather than the other way around. But how the relationship *began* changes nothing; it is undisputed that going forward, the Society acted as the principal by hiring ACS and supervising ACS's efforts.

9

The fact that ACS kept the lion's share of the money also does not help Spiegel. The essence of the nonprofit exemption is the recognition that some charities find it advantageous to contract out their fundraising efforts to private companies. *See* 18 FCC Rcd. at 14089 ¶ 128. But the TCPA does not require that the terms of these contracts be favorable to the nonprofit. In fact, asking the courts to scrutinize those relationships would come close to litigating the nonprofit's tax-exempt status—a job that Congress assigned to the IRS, not the courts. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 596-97 (1983); *Nat'l Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 488 (1979) ("The choice among reasonable interpretations of the Internal Revenue Code] is for the Commissioner, not the courts."). Of course, a one-sided funding arrangement could be evidence that a purported *agency* relationship was in fact a sham. But here, in the face of undisputed evidence that ACS was genuinely acting as the Society's agent, no reasonable jury could find that ACS was not acting on behalf of the Society. ACS is therefore entitled to summary judgment on its charitable-exemption defense.

**B. Telephone Solicitation**

Even if ACS had not been calling "on behalf of" a tax-exempt nonprofit, it would still be entitled to summary judgment on Spiegel's do-not-call claim because its calls were not "telephone solicitation[s]" covered by the TCPA. As discussed earlier, the TCPA regulations prohibit "telephone solicitation" calls to phone lines listed on the do-not-call registry. 47 C.F.R. § 64.1200(c)(2). Telephone solicitation is defined as "the initiation of a telephone call or message for the purpose of

10

encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(14); 47 U.S.C. § 227(a)(4).

ACS argues that calls soliciting money donations fall outside the letter of the statute's definition of telephone solicitation. Def.'s Br. . at 13-15. Although ACS has not cited any case law directly supporting its position, the language of the statute is clear. Telephone solicitation means a call "encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(14); 47 U.S.C. § 227(a)(4). This definition does not include requests for money *donations* that do not encourage buying, renting, or investing in some sort of property, goods, or services.[8] Spiegel responds that the Breast Cancer Society promised to use the donations to buy goods and services for cancer patients. Pl.'s Resp. Br. at 4-5. His theory appears to be that whenever a charity solicits money that will *eventually* be used to purchase goods or services for someone else, it is effectively asking the call recipient to buy those goods or services. There is no case law that supports this expansive interpretation. Indeed, neither the statutory nor the regulatory text uses words like "indirectly purchase" or "purchase for the benefit of another person." Under the

---

[8] Indeed, several state consumer protection statutes with parallel language explicitly include donations in their definitions of "telephone solicitation," making the absence of this language in the federal statute all the more striking. *See, e.g.*, A.S. 45.50.475(g)(5) (Alaska) (defining "telephone solicitation" as "solicitation by a person by telephone of a customer at the residence of the customer for the purpose of encouraging the customer to purchase property, goods, or services, *or make a donation*" (emphasis added)); R.C.W.A. 80.36.390(1) (Washington) (defining "telephone solicitation" as "the unsolicited initiation of a telephone call by a commercial or nonprofit company or organization to a residential telephone customer and conversation for the purpose of encouraging a person to purchase property, goods, or services *or soliciting donations of money, property, goods, or services*" (emphasis added)); N.C. Gen. Stat § 75–101(9) (North Carolina) (defining "telephone solicitation" as a "voice communication … for the purpose of soliciting or encouraging the purchase or rental of, or investment in, property, goods, or services … *or obtaining a charitable donation*" (emphasis added)).

11

governing text, when ACS asked for donations, it sought nothing more than gifts from the call recipients, not any purchase, rental, or investment. This means that, as a matter of law, the ACS calls were not TCPA-covered telephone solicitations, and ACS is entitled to summary judgment on the do-not-call claim.

### C. Prerecorded Voices

In his response to ACS's motion for summary judgment, Spiegel contends that ACS violated the TCPA by using prerecorded voices in calls to his residence.[9] Pl.'s Resp. Br. at 5. But neither the original nor the First Amended Complaint alleged that ACS used prerecorded voices, nor asserted a TCPA claim based on prerecorded voices.[10] *See* R.1, Cmplt.; Am. Cmplt. Nor has Spiegel sought leave to amend his complaint to add that allegation or claim. But even if this eleventh-hour claim were validly asserted, it would not help Spiegel. The TCPA restrictions on residential calls using prerecorded voice technology explicitly exempt calls made "on behalf of a tax-exempt nonprofit organization." 47 C.F.R. § 64.1200(a)(3)(iv) (exemption authorized by 47 U.S.C. § 227(b)(2)(B)). So even if Spiegel asserted a claim premised on the prerecorded-voice theory, it would fail for the same reason as the do-not-call theory.

---

[9] The TCPA prohibits "any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message." 47 U.S.C. § 227(b)(1)(B). Because the prerecorded voice prohibition applies to any telephone *call* instead of only "telephone solicitation," ACS could still have run afoul of the TCPA even if its calls did not constitute telephone solicitation.

[10] The complaints do allege that ACS made "robocalls," Cmplt. ¶ 1; Am. Cmplt. ¶ 1, but the only factual allegation supporting this claim is an allegation that the calls were made using an automatic dialer. Cmplt. ¶ 23; Am. Cmplt. ¶ 14. Thus, the complaint cannot fairly be read to allege calls using prerecorded voice technology.

## V. Conclusion

For the reasons discussed, ACS's motion for summary judgment is granted. Judgment is entered in favor of ACS and against Spiegel. With the prior Rule 54(b) judgments entered against individual Defendants James T. Reynolds and Kristina Hixon Reynolds, R. 106, this is the final judgment in the case. The status hearing of October 19, 2017 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: October 11, 2017